HALL, Judge.
This is a suit brought by DeWitt L. Py-burn and Leo M. Odom, d/b/a Pyburn & Odom, Consulting Engineers, in which they seek to recover the sum of $7,171.68 plus interest, costs and attorney’s fees allegedly due them for professional engineering fees, services, and work done and materials furnished in connection wtih the construction of the Sunshine Bridge over the Mississippi River near Donaldsonville. Made defendants are Popich Marine Construction, Inc.; Steers-Morrison-Keller (a joint venture); and American Employers’ Insurance Company.
That plaintiffs rendered the services to Popich Marine Construction, Inc. and the liability of that corporation therefor is undisputed.
Plaintiffs sought to hold Steers-Morrison-Keller and American Employers’ Insurance Company liable in solido with Pop-ich under and by virtue of the provisions ■of the Public Contracts Statute, LSA-R.S. 38:2241 et seq.
After suit was filed Popich Marine Construction, Inc. was placed in bankruptcy and on the day of the trial plaintiffs dismissed their suit against Popich without prejudice and proceeded against the other two defendants.
Following the trial judgment was rendered in favor of plaintiffs and against Steers-Morrison-Keller and American Employers’ Insurance Company in solido for the full amount of plaintiffs’ claim, plus interest, costs and 10% attorney’s fees. Steers-Morrison-Keller and American Employers’ Insurance Company appealed.
The record reveals the following undisputed facts:
Steers-Morrison-Keller was the prime contractor for the construction of the substructure of the bridge. American Employers’ Insurance Company was the surety on the prime ■ contractor’s bond. Part of the work called for by the prime contract was the fabrication of three willow mats and the placing thereof on the river bottom to prevent scouring around the piers. Steers-Morrison-Keller sub-contracted this part of the work to Popich Marine Construction, Inc. Popich was required to sink each of the three large (approximately 28CK x 45CK) willow mats and to secure same on the river bottom prior to the placing by the prime contractor of the pier caissons, and for this reason each mat had to be constructed by Popich with a hole in the center thereof in order to permit the caissons to be sunk through the mats and into the mud of the river bottom. In view of the river currents the most difficult and exacting part of the work undertaken by Popich was to sink the mats so that when they were secured on the bottom of the river the holes in the mats would be in the exact position fixed by the plans and specifications for the location of the bridge piers. This part of the job required engineering services.
On May 21, 1962 representatives of Pop-ich visited plaintiffs’ office in Baton Rouge and requested plaintiffs to perform the engineering services required in sinking the mats. Thereafter, on May 28, Mr. Higgs of *676 plaintiffs’ firm met with representatives of Popich and representatives of Steers-Morrison-Keller at the prime contractor’s office in Donaldsonville for the purpose of discussing the exact nature of the services to be performed by plaintiffs. Following this meeting plaintiffs “developed a plan for the sinking of the mats and a plan for providing surveys and necessary actions for locating the mat in its correct position.” Initial recommendations were given to Pop-ich on June 4, 1962 and on June 14, 1962 detailed drawings were submitted. The resulting agreement between Popich and plaintiffs was formalized in a “purchase order” issued by Popich Marine Construction, Inc. to Pyburn & Odom dated August IS, 1962 setting forth a schedule of charges to be made by Pyburn & Odom to Popich as follows:
$125.00 Per Diem — Each Principal
Actual Cost Expenses — Travel
Actual Cost Office (reproductions, telephone, etc.)
$15.00 per day plus .15 per Transportation: Survey Wagon
mile
.10 per mile. Passenger Cars
Cost plus 100% Assist. Engr’s., Survey Crews, draftsmen
$75.00 per day Fathometer:
or $225.00 per week
Actual Cost. Mise. Field Equip. & Special Field Supplies
Pyburn & Odom’s work consisted in making soundings and doing other preliminary survey work on the job site. Thereafter they developed a system for lowering the mats and in connection therewith made estimates of the current forces, the amount of ballast rock required, the type of rigging and the size of the lines and cables required, and how the equipment would be rigged so that adjustments in the positions of the mats could be made during the lowering process. These calculations and plans were made in plaintiffs’ office in Baton Rouge.
The actual lowering of each of the three mats to the river bottom was accomplished in the following manner under the plans and system developed by Pyburn & Odom: Each mat was floated out on the river surrounded by barges to which it was attached by ropes. The position of the mat and barges in the river was held and controlled by a cable running to a winch located on a barge which was securely anchored some distance upstream. The barges surrounding the mats were operated by Popich’s crews. Pyburn & Odom constructed and manned with its own crew a control tower situated on a barge positioned in the center hole in the mat. From this tower steel wires were run to various surveyed points on the mats so that by means of a plumb line and sightings to various fixed points on shore the exact position of the mat as it was sunk by stages (by means of rock ballast) was at all times known to Pyburn & Odom’s engineers. It was their duty to give directions so that precise adjustment of the mat’s position as it was gradually sunk could be made by means of the winch on the barge anchored upstream. Their job was completed as soon as all three mats were secured on the river bottom with the mat holes in proper position for the pier caissons to pass through.
Not having been paid for their services plaintiffs recorded a sworn statement of their claim under the provisions of the Public Contract Statute, LSA-R.S. 38:2241 et seq., gave due notice of the filing thereof as required by law, and on November 19, 1962 made formal demand for payment of their claim by means of certified mail addressed to each of the defendants. When *677 payment was not forthcoming plaintiffs filed this suit on January 9, 1963.
Plaintiffs had no direct contractual relationship with the prime contractor, Steers-Morrison-Keller, and their right of recovery against the prime contractor and its surety is dependent upon the provisions of the Public Contracts Law.
We quote with approval the following excerpts from the learned Trial Judge’s written “Reasons for Judgment”:
“The plaintiffs contend that they had a written contract with Popich to do certain work; that, therefore, they are subcontractors of the subcontractor, Popich, and as such entitled under the statute to recover the amount of their claim in full, relying principally upon the case of Chil-ders v. City of Monroe [10 La.App. 701], 122 So. 135. The defendants, on the other hand, deny that plaintiffs had a contract to do any specific work, contending that they simply supplied certain services and equipment, and that unless the items which compose the plaintiffs’ claim form a component part of the completed structure or are consumed in the work, they are not lienable nor are they covered by the contractor’s bond given under the provisions of R.S. 38 :- 2241, relying principally upon the case of Martinolich v. Albert [La.App.], 143 So.2d 745.
“The primary question to be resolved, therefore, is the nature of the legal relationship between plaintiffs and the subcontractor, Popich. If plaintiffs are found to have had a contract to do certain work and therefore legally a subcontractor, then they are entitled to recover from the surety. On the other hand, if they are held to be simply a furnisher of services and equipment and not a subcontractor they cannot recover.
“In Jesse F. Heard & Sons v. Southwest Steel Products [La.App.], 124 So.2d 211, it was said that ‘whether or not one is a subcontractor within the purview of the lien statute must be resolved from essential factors of legal significance other than a simple designation as such by the prime contractor.’ With the foregoing principles in mind we turn now to a consideration of the ‘essential factors of legal significance’ involved in the relationship between plaintiffs and Popich in an effort to determine the precise nature of that relationship.
% 5|< # # # #
“After considering all of the testimony in the record, and after considering the various exhibits introduced into evidence, particularly the ‘purchase order’ referred to above, the Court feels that the conclusion is inescapable that a contract existed between Pyburn and Odom and Popich Marine under the terms of which Pyburn and Odom were to perform the engineering services required in connection with the sinking of the mat and were to be compensated therefor in accordance with the schedule of charges set forth in the ‘purchase order.’ The fact that Py-burn and Odom were to be compensated on a ‘cost plus’ basis rather than a fixed amount does not affect the validity of the contract since there was, in the language of Civil Code Article 1779, ‘a certain object, which forms the matter of agreement,’ namely the furnishing of engineering services required in connection with the sinking of the mat, and since payment therefor was fixed and ascertainable in accordance with a previously agreed upon schedule of charges.
“The facts in the case of Childers v. City of Monroe [10 La.App. 701], 122 So. 135, are quite similar to the case at bar. In that case the City of Monroe entered into a contract to build a water and light plant and accordingly the contractor gave bond as surety under Act 224 of 1918, now R.S. 38:2241. The contract involved the construction of a ‘clear water basin’ and a ‘secondary setting basin,’ the building of which necessitated considerable excavations. The principal contractor *678 sublet to one Walker' the work of excavating for these basins, and Walker in turn employed Childers, the plaintiff, to assist in making the excavations, the agreement between them being that Childers should use his teams and laborers to remove the dirt, his compensation being fixed at $7.50 per day for each team and driver, Childers to pay the drivers. Walker defaulted and Childers brought suit against the principal contractor and its surety, and the subcontractor, Walker, seeking a judgment against them in solido for the amount of his claim plus 10% attorney fees. There was judgment for plaintiff against all parties in solido with recognition of a lien and privilege in favor of the plaintiff.
“On appeal the contention was made that the Court erred in holding that the statute governing contracts for public works, extends to and protects claims for rent of mules to subcontractors. In answering this contention the Court stated:
‘The confusion in this case, we think, has arisen over a misconstruction or a misinterpretation of the contract between the plaintiff, Childers and the subcontractor, Walker. The pleadings and the testimony show that the contract between the two was that Childers should furnish teams and drivers to excavate for the basins, Childers to receive $7.50 per day for each team and a driver. In figuring the compensation which Childers was to receive, it seems that he figured his teams at $5 per day and his drivers at $2.50 per day each. The parties seem to have called this a contract for mule or team rent. But whatever they may have called it, it was in fact a contract to excavate, move dirt in connection with the building of the water and light plant. Childers, the plaintiff, hired his own drivers and put them in charge of his teams, and, with the teams and drivers, the work was done. In other words, Childers did the work and used the teams to accomplish it. Our construction of the contract is that it was no more nor less than a contract to do work and that plaintiff’s claim is fully protected by the contract and bond.’
“Similarly, in the instant case, plaintiffs had a contract with the subcontractor, Popich, to do certain work, namely, to furnish the engineering services required in connection with the sinking of the mat. The term ‘work’ as used in the statute has a much more comprehensive meaning than the word ‘labor’ and has been construed to include the performance of any task, duty, or the like, and to cover all forms of physical or mental exertion, or both combined. Silver v. Harris [Harriss], 165 La. 83, 115 So. 376, State v. Rose, 125 La. [462] 463, 51 So. [496] 497 [26 L.R.A..N.S., 821], There can be no doubt that a contract to perform the engineering services required in connection with the sinking of the mat is a contract to do work within the purview of the statute.
“The defendants rely upon the case of Martinolich v. Albert, 143 So.2d 745 decided by the First Circuit in 1962, wherein the Court denied recovery for the rental of certain manned equipment furnished to the subcontractor, Albert, in connection with the construction of sewerage facilities for the City of Thibodaux. Counsel for plaintiff in that case contended that the holinng in the Childers case was absolute authority for judgment in favor of the plaintiff.
“The Court in the Martinolich case had this to say about the relationship between the plaintiff and the subcontractor in that case:
‘There was no testimony that there was any contract to do a certain work, nor continuous work, and by no stretch of the imagination could the plaintiff be termed a subcontractor under Albert. The only charge the plaintiff made was by the hour for *679 the manned equipment. The supervision and control of the manned equipment was with the subcontractor while on the job, however, there is nothing to show that the plaintiff could not have recalled his manned equipment at any time he saw fit, without regard to the progress of the work.’
“As Judge Ellis, the organ of the Court in the Martinolich case pointed out, that case is clearly distinguishable from the Childers case. In the Childers case the plaintiff was found to have had a contract to do work, and to be a subcontractor of the subcontractor and as such entitled to recover from the surety. On the other hand, in the Martinolich case, there was not ‘any contract to do a certain work, nor continuous work, and by no stretch of the imagination could the plaintiff be termed a subcontractor under Albert,’ and hence he was not entitled to recover.
“In the instant case the rather prolonged and careful negotiations between plaintiffs and Popich, culminating in an agreement to perform the work in question only after the prior approval of United Gas Pipeline Co. was obtained, and formalized by the ‘purchase order’ issued by Popich to Pyburn and Odom, can only be regarded as a contract to do a certain work, namely, perform the engineering services required in the sinking of the mat, for a specified and previously agreed upon schedule of charges. As such the plaintiffs were subcontractors of Popich and entitled under the statute to recover from the prime contractors’ surety.”
* ‡ * * * *
Defendants-appellants concede that the primary question presented is whether Pyburn & Odom were sub-contractors of the subcontractor, Popich Marine Construction, Inc., but contend that the Trial Court erred in so holding. They contend that Pyburn & Odom rendered only consulting engineering services to Popich and neither undertook nor performed any portion of the work undertaken by the sub-contractor, and contend that nowhere in the Public Works Statute can any authority be found for the recovery of fees and charges for professional engineering services, nor any authority for the recovery of travel expenses, telephone expense or for the other items of charges going to make up plaintiffs’ total claim.
Considering the facts of the case which we have detailed at some length herein we are of the opinion that plaintiffs did in fact undertake to perform and did perform for Popich a part of the work called for by Popich’s sub-contract. Popich contracted to install the mats on the river bottom in an exact position,, a difficult feat in view of the river currents and other conditions. This could not be accomplished without the services of engineers. Mr. Robert J. Brown, formerly project engineer for Popich, testified that the services rendered by plaintiffs were necessary to insure the successful completion of the mat-sinking operations, and that the services actually rendered and performed by them with their crew and equipment were a part of the necessary work for the construction of the sub-structure of the bridge. Earl Larson, project engineer for the prime contractor, testified that the designs which Pyburn & Odom submitted to Popich had to be approved by him and also by the brige engineers in Mobile. He further testified that if Pyburn & Odom had not stayed on the job and finished the work his own engineering staff would have had to do it. It is clear to us that Pyburn & Odom perfprmed “work” for the payment of which the surety is liable under the provisions of LSA-R.S. 38:2241.
We agree with defendants-appellants that the statute contains no authority for recovery of engineering services, travel expenses and other items going to make up plaintiffs’ ¡claim for $7,171.68 if these *680 items are considered one by one. However, in our opinion, plaintiffs’ contract with Popich was to do a certain job and the itemization of the charges came about solely because they undertook to do the work on a cost plus basis as the purchase order reveals. Surely if plaintiffs’ contract with Popich had been on a lump sum basis, the lump sum charged would have included charges sufficient to cover all of the individual items and the surety would have been liable therefor. We are of the opinion that plaintiffs are entitled to a judgment against the surety for the full amount of $7,171.68 prayed for plus 10% thereof as attorney’s fees under the provisions of LSA-R.S. 38:2246.
We' note that the judgment appealed from cast the prime contractor in solido with the surety. In his “Reasons for Judgment” the Trial Judge stated that the suit was basically a claim by plaintiffs against the surety and hence most of his remarks were directed toward the liability of the surety. He apparently rendered judgment against the prime contractor also because that was done in the Childers case, cited by him.
Defendants-appellants contend that there is no statutory authority in the Public Works Act which imposes personal liability on the prime contractor for claims by one furnishing services to a sub-contractor, and since there was no privity of contract between plaintiffs and the prime contractor, the prime contractor should have been dismissed from the suit, citing Martinolich v. Albert, 143 So.2d 745.
We are of the opinion that there is sufficient authority in the statute for holding the prime contractor liable. LSA-R.S. 38:2241 states that the bond shall be “executed by the contractor” as well as the surety. LSA-R.S. 38:2247, as amended, reads in part as follows:
“Nothing in this part shall be construed to deprive any person or claimant * * * of his right of action on the contractor’s bond * * * which said action must be brought against the surety or the contractor within one year * * * j except that before any person having a direct contractual relationship with a subcontractor but no contractual relationship with the contractor shall have a right of action against the contractor or the surety on the bond furnished by the contractor, he shall record his claim as provided in R.S. 38:2242 * * (Emphasis supplied)
The surety is bound “ * * * for the faithful performance of the contract with an additional obligation for the payment by the contractor or subcontractor for all work done, labor performed, or material or supplies furnished for the construction, alteration, or repair of any public works * * *” (See LSA-R.S. 38:2241). It would be an anomaly if the contractor is bound to a less extent than the surety on its bond.
For the foregoing reasons the judgment appealed from is affirmed, costs of this appeal to be borne by appellants.
.Affirmed.